IN THE COURT OF APPEALS OF TENNESSEE

AT KNOXVILLE

FILED

March 00, 1999

Cecil Crowson, Jr.
Appellate Court
Clerk

MICHELLE BALL, for herself and ) C/A NO. 03A01-9804-CV-00139
as next of kin of MIRANDA K. )
BALL, deceased, )
  )
        Plaintiff-Appellant, )
  )
  )
  ) APPEAL AS OF RIGHT FROM THE
v. ) HAMILTON COUNTY CIRCUIT COURT
  )
  )
  )
  )
HAMILTON COUNTY EMERGENCY )
MEDICAL SERVICES, )
  )
  ) HONORABLE W. NEIL THOMAS, III,
        Defendant-Appellee. ) JUDGE

For Appellant

MICHAEL E. RICHARDSON
Poole, Thornbury, Morgan
  & Richardson
Chattanooga, Tennessee

For Appellee

RHEUBIN M. TAYLOR
Hamilton County Attorney
Chattanooga, Tennessee

MARY NEILL SOUTHERLAND
Assistant Hamilton County Attorney
Chattanooga, Tennessee

# O P I N I O N

1

AFFIRMED AND REMANDED                                    Susano, J.

This civil action was filed by Michelle Ball ("Ms. Ball") against Hamilton County Emergency Medical Services ("HCEMS") and others,[1] seeking damages for the wrongful death of Ms. Ball's 16-month-old daughter, Miranda K. Ball ("Miranda"[2]). The suit against HCEMS brought into play the provisions of the Governmental Tort Liability Act. Following a bench trial, the court dismissed the complaint as to HCEMS, finding that HCEMS did not have a duty to transport Miranda to the hospital in the face of her mother's decision that the child's condition was not such as to require a trip to the hospital. The court further found that HCEMS's emergency medical technicians ("the EMTs")[3] did not violate their standard of care by failing to advise Ms. Ball that croup could be life-threatening under certain circumstances. Ms. Ball appealed, raising issues that present the following questions for our determination:

> 1. Did the trial court err in finding that HCEMS had no duty in this case to transport Miranda to the hospital?
>
> 2. Did the trial court err in finding that the EMTs did not violate their standard of care in failing to advise Ms. Ball that Miranda's croup condition could be life-

---

[1] Ms. Ball sued several entities and Dr. Tim Davis. When this matter was originally appealed to this Court, Ms. Ball's complaint against Dr. Davis, had not yet been resolved. We remanded this case to the trial court for the entry of a final judgment as to the action against HCEMS. Subsequently, the trial court entered a judgment dismissing the complaint against HCEMS pursuant to the provisions of Rule 54.02, Tenn.R.Civ.P. Hence, the judgment in favor of HCEMS is now final and appealable as of right. *See* Rule 3(a), T.R.A.P.

[2] For ease of reference, the child will be referred to by her first name. No disrespect is intended.

[3] The EMTs were not sued individually.

threatening if the child was not transported
to the hospital?

3.  Did the trial court err in absolving
HCEMS of any fault in Miranda's death?


I.  *Facts*


On November 7, 1993, Miranda developed a deep hacking

cough.  Around 7:30 that night, her mother took her to the

emergency room of East Ridge Hospital ("East Ridge") in

Chattanooga.  Ms. Ball was a licensed practical nurse at that

facility.  Miranda was seen by an emergency room physician who

diagnosed her condition as an ear infection and nasal congestion.

The doctor prescribed medication and gave Ms. Ball a bulb

syringe, following which she returned home with her daughter.


Miranda continued to have symptoms that night.  At

approximately 12:30 the next morning, she was again brought by

her mother to the emergency room of East Ridge.  She was then

having difficulty breathing, had been choking, and her lips had

turned blue.  After observing her for two hours and administering

epinephrine,[4] a doctor on duty advised Ms. Ball to take Miranda

to T. C. Thompson Children's Hospital ("Thompson's") for further

evaluation and care.  East Ridge apparently did not have

facilities to care for pediatric patients.  The record reflects

that the East Ridge emergency room physician contacted Dr. Tim

_____

[4]Epinephrine is "[a] white to brownish crystalline compound,...,used in
medicine esp. as a heart stimulant, muscle relaxant, and vasoconstrictor."
WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 438 (3d ed. 1994).

4

Davis at Thompson's and discussed Miranda's condition with him. He told Dr. Davis that he was sending the child to him for a second opinion as to her condition.

Dr. Davis examined Miranda and found her to be "[a]lert, no stridor at rest,...skin okay." When he saw the child, he found that she was breathing normally. He determined that she had an adequate level of oxygen in her blood. Dr. Davis diagnosed Miranda's condition as croup. He testified at trial that croup

> is a viral infection of the large airway, the trachea, the big breathing tube that goes down into the lungs....It usually gives you fever and inflammation or edema of the airway...it is...a relapsing and remitting disease, usually getting worse at night and better in the daytime. It is a usually benign condition...[which] means usually people who have it do not come to harm.

Dr. Davis prescribed cough syrup, instructed a nurse to give Ms. Ball written instructions regarding management of croup, and sent Miranda home after cautioning her mother to return to the hospital if Miranda's condition worsened.

Ms. Ball testified that neither of the physicians who saw Miranda that evening told her that croup could be life-threatening. In fact, Ms. Ball testified that Dr. Davis told her that the condition was not life-threatening; in his words, "kids don't die from croup these days."

5

At approximately 6:00 p.m. on November 8, 1993, Miranda turned blue and stopped breathing. Ms. Ball's mother called 911, a department of HCEMS, and advised the operator that Miranda was suffering from croup and had quit breathing. An HCEMS ambulance was immediately dispatched. When the EMTs arrived at Ms. Ball's house, the child had improved. She was sitting in her mother's lap. Ms. Ball told the EMTs that she had suctioned Miranda's nasal passage. She reported that her daughter was better than she had been when the 911 call was placed. The EMTs checked Miranda's pulse and respiratory rate, and listened to her lungs. They concluded that while she had congestion in her lungs, she was not in respiratory distress. The EMTs left the house after telling Ms. Ball that she should call 911 if Miranda got worse. They suggested that she see a pediatrician in the morning. Miranda was playful and smiling when they left.

There was sharply conflicting testimony at trial as to whether the EMTs offered to transport Miranda to the hospital. Another issue was whether Ms. Ball refused to allow her daughter to be taken to the hospital. The EMTs testified that on at least three occasions, they offered to take Miranda to the hospital. They testified that Ms. Ball responded, "I don't think we need to go to the hospital at this time." Ms. Ball and her mother, however, testified that the EMTs did not offer to transport Miranda to the hospital. They did acknowledge signing a "Refusal of Services and Release of Liability" form that contained the following language: "Refused first aid or emergency care offered

6

to me or the patient"; but they explained that they signed the form thinking it was only an acknowledgment that HCEMS had answered the call. The trial court found these various factual issues adverse to the plaintiff. The evidence does not preponderate against these findings. *See* Rule 13(d), T.R.A.P.

It was undisputed at trial that the EMTs did not call either of the hospitals at which Miranda had earlier been treated. It is also clear from the record that the EMTs did not advise Ms. Ball that Miranda might die if she was not transported to the hospital.

Miranda stopped breathing some four hours after the EMTs left. As Ms. Ball attempted to resuscitate the child, her mother again called 911. The same EMTs who had answered the earlier call arrived within minutes of the new distress call. They assessed the situation as a "load and go" -- *i.e.*, an extreme emergency -- and transported Miranda to the nearest medical facility. Miranda died of cardiac arrest on November 10, 1993.

Following a bench trial, the court found in favor of HCEMS, noting in its memorandum opinion as follows:

> The Court, after considering the testimony of all the witnesses, including the deposition testimony and argument of counsel, is of the opinion the defendant, [HCEMS], was not required to transport the minor child to a

7

hospital when services were refused by the mother. The Court is further of the opinion the EMS paramedics did not violate the standard of care required of paramedics in the same or similar circumstances as those shown by the proof in this case. At the time the paramedics arrived and observed the child, she was awake, alert, smiling, and as her mother said, flirting with the paramedics, and was in no respiratory distress. Paramedic Carroll performed an assessment of the child and found the child was in no acute distress. His diagnosis that the child had congestion in one lung was obviously correct. According to a preponderance of the evidence, Mr. Carroll offered to transport the child to the hospital three different times, but each was refused by the plaintiff. The Court finds that Mr. Carroll did not have the authority, nor did he have the obligation to transport the child to a hospital without parental consent.

## II. *Standard of Review*

Our review of this non-jury case is *de novo* upon the record with a presumption of correctness as to the trial court's factual findings, unless the "preponderance of the evidence is otherwise."  Rule 13(d), T.R.A.P.; **Wright v. City of Knoxville***,* 898 S.W.2d 177, 181 (Tenn. 1995); **Union Carbide v. Huddleston**, 854 S.W.2d 87, 91 (Tenn. 1993); **Catlett v. Chinery**, 952 S.W.2d 433, 434 (Tenn.App. 1997).  The trial court's conclusions of law are not accorded the same deference.  **Campbell v. Florida Steel Corp.,** 919 S.W.2d 26, 35 (Tenn. 1996)**; Presley v. Bennett**, 860 S.W.2d 857, 859 (Tenn. 1993).  Our review is tempered by the well-established principle that the trial court is in the best position to assess the credibility of the witnesses; accordingly, such determinations are entitled to great weight on appeal.  **Massengale v. Massengale**, 915 S.W.2d 818, 819 (Tenn.App. 1995); **Bowman v. Bowman**, 836 S.W.2d 563, 567 (Tenn.App. 1991).

## III. *Analysis*

### A.

Ms. Ball contends that HCEMS was negligent in (1) failing to transport Miranda to the hospital on the occasion of the EMTs' first visit to the home; and in (2) failing to fully advise her of the risks associated with her withholding of consent to have her daughter transported to the hospital.

9

"A negligence claim requires proof of the following elements: (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause." *Coln v. City of Savannah*, 966 S.W.2d 34, 39 (Tenn. 1998); *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993).

A threshold requirement in any negligence claim is the existence of a legal duty. *Coln*, 966 S.W.2d at 39. The existence of a legal duty is a question of law for the court. *Id.* at 39; *McClung v. Delta Square Ltd. Pshp.*, 937 S.W.2d 891, 894 (Tenn. 1996); *Bradshaw*, 854 S.W.2d at 869; *Lindsey v. Miami Development Corp.*, 689 S.W.2d 856, 858-59 (Tenn. 1985); *Dooley v. Everett*, 805 S.W.2d 380, 384 (Tenn.App. 1990). In *Coln*, the Supreme Court gave guidance in determining when a legal duty exists:

> ...the existence of a legal duty...requires consideration of whether "such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of others-- or, more simply, whether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant."

*Id.*, 966 S.W.2d at 39 (quoting *Bradshaw*, 854 S.W.2d at 869-70). In the field of emergency medical services, a duty is imposed on EMTs by legislative enactment:

10

> Emergency medical services personnel shall exercise the skills and abilities needed to render appropriate emergency medical care and provide emergency medical services in accordance with authorized procedures in the respective level of training, and shall administer care to patients based upon knowledge and application of principles derived from accepted practice and medical approval,...

T.C.A. § 68-140-509(a). Emergency medical services are defined in T.C.A. § 68-140-502(11) as "the services utilized in responding to the perceived need for immediate medical care in order to prevent loss of life or aggravation of illness or injury."

B.

We do not believe that the relationship between HCEMS and Ms. Ball and her daughter was such as to give rise to a right -- much less a legal duty -- flowing to HCEMS to transport Miranda, a 16-month-old child, to the hospital in a non-emergency situation, in the face of her mother's decision that such a move was not necessary. Society has long recognized a parent's right to be free of interference from the state in the rearing of their children. *Hawk v. Hawk*, 855 S.W.2d 573 (Tenn. 1993). A parent is free to make choices regarding medical care for a child so long as such decisions do not jeopardize the health or safety of the child. *Id*. at 578; *Cardwell v. Bechtol*, 724 S.W.2d 739, 744 (Tenn. 1987); *Rust v. Rust*, 864 S.W.2d 52, 55-56, (Tenn.App. 1993).

11

There is nothing in T.C.A. §§ 68-140-509(a) and 68-140-502(11) to suggest the existence of the duty urged upon us by the plaintiff in this case. Furthermore, the cases cited above clearly support a holding to the contrary. They indicate that a governmental entity -- here HCEMS -- is not at liberty to substitute its judgment for that of a parent regarding whether or not a minor child should be transported to the hospital in a non-emergency situation.

The first issue is found adverse to the plaintiff.

C.

The plaintiff next argues that HCEMS violated its statutory standard of care in this case by failing to advise her of the risks associated with not transporting Miranda to the hospital. We disagree.

Ms. Ball testified that, when the EMTs first arrived at her house, "[Miranda] was sitting on [her mother's] lap, and she was alert....her eyes were open. She was flirting. She wasn't breathing good though." After a physical examination of Miranda, the EMTs determined that she had some congestion in her lungs, but that she was not in respiratory distress. They testified that there were no symptoms of an immediate life-threatening nature. As a consequence, they did not proceed with their protocol for respiratory distress. They testified further that Miranda did not manifest symptoms rising to a level that would

12

require them to begin emergency care "in order to prevent loss of life or aggravation of illness or injury."[5]  *See* T.C.A. § 68-140-502(11).

HCEMS had a duty to render *emergency* medical services as defined in T.C.A. § 68-140-509(a).  That duty is measured by the standard of care of *emergency* medical services personnel. *Id*.  *See also* T.C.A. § 68-140-502(11).  The scope of that duty is a question of fact to be determined by the trier of fact.  **Dooley v. Everett**, 805 S.W.2d 380, 384 (Tenn.App. 1990).

The trial court, as the trier of fact, heard competing testimony as to the standard of care applicable to the facts of this case.  It accredited testimony opining that the applicable

---

[5]HCEMS's Chief of the Emergency Medical Services testified as follows to questions posed by the trial court:

> THE COURT:    ...regardless of what the protocol requires the EMT to do in certain situations they must recognize the situation or identify the situation as being a certain situation in order to apply the protocol.
>
> THE WITNESS: Yes, sir.  Yes, sir.
>
> THE COURT:    And if they don't recognize or don't believe that a particular situation or condition exists at the time they respond to the call, then they're not required or responsible for using protocols.
>
> THE WITNESS: Yes, sir, that's correct.  If a patient has-- if you got a call, you would not automatically refer to the protocol for a chest pain unless the patient is presented with chest pain.
>
> * * *
>
> THE COURT:    And unless the EMT recognized or believed to be present the symptoms that identifies stridor, they would not use this respiratory protocol.
>
> THE WITNESS: That's correct.  Yes, sir.

13

standard of care did not obligate the EMTs to advise Ms. Ball of the life-threatening nature of croup when the facts, as reasonably perceived by the EMTs, did not reflect a life-threatening condition. In short, the trial court found that the EMTs were not presented with an emergency and hence were not required to warn Miranda's mother about risks that were not implicated by the child's condition.

The trial court found that the EMTs did not violate the standard of care "required of paramedics in the same or similar circumstances." It noted that Miranda's physical condition at the time the EMTs responded to the call was that "she was awake, alert, smiling, and as her mother said, flirting with the paramedics, and was in no respiratory distress." Furthermore, the proof clearly shows that croup is not normally a life-threatening condition.[6]

As we have previously stated, it is for the finder of fact to determine the standard of care. *Dooley*, 805 S.W.2d at 384. In the instant case, we find and hold that the evidence does not preponderate against the trial court's finding that the defendant's EMTs did not violate their standard of care by failing to advise Ms. Ball of the life-threatening risk of croup when the EMTs reasonably concluded that Miranda's croup had not advanced anywhere near the stage that would render it life-

[6]A medical expert testified that what happened to Miranda was on the "far end of the bell curve in terms of the outcome."

14

threatening or otherwise present an emergency condition requiring immediate removal to the hospital.  Hence, the evidence does not preponderate against the trial court's determination that the plaintiff's case lacks the factual predicate necessary to impose liability on HCEMS.

IV.  *Conclusion*


   For the reasons stated herein, the judgment of the trial court is affirmed.  Costs on appeal are taxed against the appellant.  This case is remanded to the trial court for collection of costs assessed there, pursuant to applicable law.


                   _____
                   Charles D. Susano, Jr., J.


CONCUR:


_____
Herschel P. Franks, J.


_____
Don T. McMurray, J.